**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **KAYLA MOSLEY**<br>**JONATHAN AUSTIN,**<br>***Individually, as parents and next friends of minor children, and on behalf of all others similarly situated,***<br><br>**Plaintiffs**,<br>v.<br><br>**NETFLIX, INC.,**<br>***A Delaware Corporation***<br><br>**Defendant**. | CASE NO. 5:26-cv-2534<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Kayla Mosley and Jonathan Austin, individually, as parents and next friends of their minor children, and on behalf of the Class defined herein of similarly situated consumers, bring this class action suit for damages and equitable relief against Netflix, Inc. ("Defendant" or "Netflix"). Plaintiffs allege the following based upon personal information as to allegations regarding themselves, certain *parens patria* actions by attorneys general, additional investigation of their counsel, and on information and belief as to all other allegations.

# I. INTRODUCTION

## A. Warning Signs Give Rise to Concerns About Social Media.

1. Distressed families gathered in the audience for the January 2024 U.S. Senate Judiciary Committee hearing on social media and child safety.[1] As Meta CEO Mark Zuckerberg addressed the crowd, apologizing for what the families had been through, parents held up photographs of their children who took their own lives due to harassment on social media.[2] The crowd applauded as multiple U.S. senators admonished Zuckerberg for failing to ensure child safety on Meta platforms Facebook and Instagram.[3]

2. The parents in the audience emblematize widespread concerns over the impact of social media on children's well-being.[4] To the dismay of parents, guardians, and other caregivers across the nation, the United States is currently enduring a "youth mental health crisis."[5] Levels of clinical depression

---

[1] *See* Kerry Breen, Meta CEO Mark Zuckerberg Apologizes to Parents of Victims of Online Exploitation in Heated Senate Hearing, CBS News, https://www.cbsnews.com/news/mark-zuckerberg-apologizes-parents-victims-online-exploitationsenate -hearing/ [https://perma.cc/NT8J-7CNH] (Jan. 31, 2024). The hearing addressed online child sexual exploitation, and CEOs of major social media platforms, including Instagram, TikTok and Snapchat answered questions on social media's impact on children. Id.

[2] *See* Cheyenne Haslett & Alexandra Hutzler, Mark Zuckerberg Apologizes to Families as Senate Grills Tech CEOs, ABC News (Jan. 31, 2024), https://abcnews.go.com/Politics/social-media-ceos-face-grilling-senators-child-safety/story?id=106825984 [https://perma.cc/D2ZN-UGZP] (showing Zuckerberg apologizing to families in the audience, some of whom held up photographs of their children who took their own lives).

[3] See Kate Gibson, Mark Zuckerberg Accused of Having "Blood on His Hands" in Fiery Senate Hearing on Internet Child Safety, CBS News, https://www.cbsnews.com/news/mark-zucker-bergmeta-x-child-exploitation/ [https://perma.cc/W8QXBJD2] (Jan. 31, 2024) (reporting that the audience applauded and cheered when Senator Lindsey Graham accused Zuckerberg of having a "product that's killing people"); Haslett & Hutzler, supra (recounting how various senators critiqued Zuckerberg at the Senate Judiciary Committee Hearing). Senator Lindsey Graham was not Zuckerberg's only critic; rather, the Chair of the Committee, Senator Dick Durbin, criticized social media platforms for their failure to protect children. Breen, supra. Furthermore, Senator Jonathan Ossoff prompted Zuckerberg to admit to the danger his platforms pose to young people, Senator John Kennedy questioned Zuckerberg's ability to run his company, and Senator Josh Hawley asked Zuckerberg if he would "like to apologize for what [he had] done to these good people," referring to the grieving parents in the crowd. Haslett & Hutzler, supra.

[4] Alli Aldis, New Survey Explores Parent Concerns on Social Media Usage and Absenteeism, EdChoice (Oct. 12, 2023), https://www.edchoice.org/engage/new-survey-explores-parent-concerns-on-social-media-usage-and-absenteeism/ [https://perma.cc/VVA9-749Q] (finding that about "[h]alf of parents" are "extremely or very concerned" about social media's impact on child mental health).

[5] See Fact Sheet: Biden-Harris Administration Announces Actions to Protect Youth Mental Health, Safety & Privacy Online, Am. Presidency Project (May 23, 2023), https://www.presidency.ucsb.edu/documents/fact-sheet-biden-harris-administration announces-actions-protect-youth-mental-health [https://perma.cc/FJN4-P6PY] (proclaiming an "unprecedented youth mental health crisis" in the United States); Janelle Chaves, Children's Mental Health Tops List of

among teenagers doubled between 2011 and 2019.[6] The increase in adolescents struggling with mental health tracks closely to the rising proliferation of social media usage, and this correlation has ignited widespread concern for the impact of social media on youth[7] mental health.

3. Many, particularly kids, spend much of their waking hours on screens.[8] Teens spend an average of eight and a half hours on screens[9] (not including time dedicated to schoolwork). Half of teens say they are nearly "constantly online".[10] This phenomenon started around 2009 when the smartphone and social networks became popular.[11] Smartphones gave people the ability to take online communications anywhere, while social networks replaced many in-person interactions, especially for teens. The science wars regarding the impact of screen time--particularly social media, games, and smartphone

---

Parent Worries, Survey Finds, CNN (Jan. 31, 2023), https://www.cnn.com/2023/01/31/health/mental-health-parenting-survey/ [https://perma.cc/G5W9-W5WX] (reporting that 40% of parents in the United States are "extremely" or "very" concerned that their children will suffer from depression or anxiety); see also Erika Edwards, CDC Says Teen Girls Are Caught in an Extreme Wave of Sadness and Violence, NBC News, https://www.nbcnews.com/health/health-news/teen-mental-health-cdc-girls-sadness-violence rcna69964 [https://perma.cc/KEU4-ACPC] (Feb. 13, 2023) (finding that a large percentage of teenagers could not partake in their regular activities due to feeling hopeless or sad).

[6] The Ezra Klein Show, Transcript: Ezra Klein Interviews Jean Twenge, N.Y. Times. (May 19, 2023), https:// www.nytimes.com/2023/05/19/podcasts/transcript-ezra-klein-interviews-jean-twenge.html [https://perma.cc/T53E-M5KB](discussing the trends in survey data on youth mental health). Psychologist Jean Twenge suggests that social media use, and the resulting changes in how teens spend their time outside school, temporally aligns to the rise in youth mental health struggles. Id.

[7] In 2021, researchers found that 38% of eight to twelve years olds used social media, a 7% increase from 2019.

[8] For example, one 2024 survey finds that the average screen time in the U.S. is around seven hours. Revealing Average Screen Time Statistics, Backlinko, https://backlinko.com/screen-time-statistics [https://perma.cc/7VSJ-WRRM] (Mar. 11, 2024).

[9] Victoria Rideout, Alanna Peebles, Supreet Mann & Michael B. Robb, Common Sense, The Common Sense Census: Media Use by Tweens and Teens 1, 3 (2021), https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf [https://perma.cc/P287-PMGW] (applies to media screen time).

[10] Teens and Internet Device Access Sheet, Pew Rsch. Ctr. (Jan. 5, 2024), https://www.pewresearch.org/internet/fact-sheet/teens-and-internet-device-access-factsheet/ [https://perma.cc/DLF4-MKR2] (reporting that 46% of teens report being almost constantly online).

[11] Josh Boyd, The History of Facebook: From BASIC to Global Giant, Brandwatch (Jan. 25, 2019), https://www. brandwatch.com/blog/history-of-facebook/ [https://perma.cc/NLM8-6HHP]; Susannah Fox & Lee Rainie, The Web at 25 in the U.S., Pew Rsch. Ctr. (Feb. 27, 2014), https://www.pewresearch.org/internet/2014/02/27/the-web-at-25-in-the-u-s/[https://perma.cc/8J8Q-WXNP]; Chris Quick, With Smartphone Adoption on the Rise, Opportunity for Marketers Is Calling, Nielsen (Sept. 2009), https://www.nielsen.com/us/en/insights/article/2009/with-smartphone-adoption-on-the-riseopportunity-for-marketers-is-calling/ [https://perma.cc/RBW3-KMWT].

use--on kids have been ongoing for more than a decade.[12] While adults are affected as well, the strongest evidence points to the impact on kids, specifically addiction,[13] cognitive development problems,[14] mental health issues (including depression, anxiety and suicide),[15] difficulty focusing,[16] lack of sleep,[17] and social isolation.[18] While the tech industry is continuing to challenge the

---

[12] Gaia Bernstein, Unwired: Gaining Control over Addictive Technologies, 26-28 (2023) (explaining that science wars erupt when scientific evidence suggests that corporate action causes consumer harm, and corporate entities fight this evidence with their own cadre of studies).

[13] Id. at 16-20. The World Health Organization included "Gaming Disorder" as a disorder. Inclusion of "Gaming Disorder" in ICD-11, World Health Org. (Sept. 14, 2018), https://www.who.int/news/item/14-09-2018-inclusion-of-gaming-disorder-inicd-11 [https://perma.cc/MYD9-N79T].

[14] Bernstein, supra, at 6-20, 22-24. For examples of specific studies, see Sheri Madigan, Dillon Browne, Nicole Racine, Camille Mori & Suzanne Tough, Association Between Screen Time and Children's Performance on a Developmental Screening Test, 173 Jama Pediatrics 244 (2019); John S. Hutton, Jonathanathan Dudley, Tzipi Horowitz-Kraus, Tom DeWitt & Scott K. Holland, Associations Between Screen-Based Media Use and Brain White Matter Integrity in Preschool-Aged Children, 174 Jama Pediatrics 1 (2020); Tzipi Horowitz-Kraus & John S. Hutton, Brain Connectivity in Children Is Increased by the Time They Spend Reading Books and Decreased by the Length of Exposure to Screen-Based Media, 107 Acta Paediatrica 685 (2018); Hongmei Wang, Chenwang Jin, Kai Yuan, Tahir Mehmood Shakir, Cuiping Mao, Xuan Niu, Chen Niu, Liping Guo & Ming Zhang, The Alteration of Gray Matter Volume and Cognitive Control in Adolescents with Internet Gaming Disorder, 9 Frontiers in Behav. Neuroscience 1 (2015); Martin P. Paulus, Lindsay M. Squeglia, Kara Bagot, Joanna Jacobus, Rayus Kuplicki, Florence J. Breslin, Jerzy Bodurka, Amanda Sheffield Morris, Wesley K. Thompson, Hauke Bartsch & Susan F. Tapert, Screen Media Activity and Brain Structure in Youth: Evidence for Diverse Structural Correlation Networks from the ABCD Study, 185 NeuroImage 140 (2019).

[15] See Haidt, supra, at 19-44, 140-72, 173-97; Jean M. Twenge, Generations: The Real Differences Between Gen Z, Millennials, Gen X, Boomers, and Silents--and What They Mean for America's Future 392-416 (2023). In addition, studies show that heavy social media use is related to deteriorating mental health in kids. A longitudinal cohort study of U.S. adolescents aged 12-15 (n=6,595) that adjusted for baseline mental health status found that adolescents who spent more than three hours per day on social media faced double the risk of experiencing poor mental health outcomes, including symptoms of depression and anxiety. Off. of the Surgeon Gen., Social Media and Youth Mental Health 6 (2023) (citing Kira E. Riehm, Kenneth A. Feder, Kayla N. Tormohlen, Rosa M. Crum, Andrea S. Young, Kerry M. Green, Lauren R. Pacek, Lareina N. La Flair & Ramin Mojtabai, Associations Between Time Spent Using Social Media and Internalizing and Externalizing Problems Among US Youth, 76 Jama Psychiatry 1266-73 (2019)), https://www.hhs.gov/sites/default/files/sg-youth-mentalhealth-social-media-advisory.pdf [https://perma.cc/F6AS-TAUP]; see also Matthew B. Lawrence, Public Health Law's Digital Frontier: Addictive Design, Section 230, and the Freedom of Speech, 4 J. Free Speech L. 299, 308-12 (2023) (discussing public health concerns).

[16] Gloria Mark, Attention Span: The Science of Focus in The Digital Age 221-41 (2023).

[17] See generally Kids Online Health and Safety Task Force, Online Health and Safety for Children and Youth: Best Practices for Families and Guidance for Industry 10-12 (2024), https://www.ntia.gov/sites/default/files/reports/kids-online-healthsafety/2024-kohs-report.pdf [https://perma.cc/ETS9-WTUP].

[18] Adolescents and young adults in 2019 (even before the pandemic) spent twenty-five minutes less a day socializing in person with others than those in 2012. Twenge, supra, at 409-10 fig. 6.46. That translates to three hours a week, thirteen hours a month, and 152 hours a year less in the company of others. Id.

accumulating data,[19] prominent governmental bodies and associations that evaluate the data have become concerned about the connection between excessive screen time and kids' public health and have raised alerts.[20]

4. Although social media can provide a space for youth to express themselves and connect with others, it can also negatively impact their mental health and well-being.[21] On a fundamental level, social media use displaces other healthy activities and alters how youth connect with the world around them.[22] Furthermore, excessive social media use is linked to attention and sleep problems, and it can result in individuals feeling as if they are being excluded by their peers.[23]

---

[19] See, e.g., Kate Gibson, Mark Zuckerberg Accused of Having "Blood on His Hands" in Fiery Senate Hearing on Internet Child Safety, CBS News, https://www.cbsnews.com/news/mark-zuckerberg-meta-x-child-exploitation/ [https://perma.cc/55NH-MKQB] (Jan 31. 2024, 7:57 PM) (reporting that Meta's founder and CEO, Mark Zuckerberg, testified in congressional hearings and repeatedly refuted a link between Facebook and teen mental health).

[20] See Kids Online Health and Safety Task Force, supra, at 10-12; Off. of the Surgeon Gen., supra, at 6-12; Am. Psych. Ass'n, Health Advisory on Social Media Use in Adolescence (2023), https://www.apa.org/topics/social-mediainternet/health-advisory-adolescent-social-media-use.pdf [https://perma.cc/KMW5-GAYZ]; Am. Psych. Ass'n, Potential Risks of Content, Features, and Functions (2024), https://www.apa.org/topics/social-media-internet/psychological-sciencebehind-youth-social-media.pdf [https://perma.cc/3KMH-GUXH].

[21] Am. Psych. Ass'n, Health Advisory on Social Media Use in Adolescence 3 (2023), https://www.apa.org/topics/social media-internet/health-advisory-adolescent-social-media-use.pdf [https://perma.cc/FNX3-R8Y6] (examining the positive and negative effects of social media use on teenagers); Chris Hollis, Sonia Livingstone & Edmund Sonuga-Barke, The Role of Digital Technology in Children and Young People's Mental Health--A Triple-Edged Sword?, 61 J. Child Psychy. & Psychiatry 837 (2020) (explaining that although social media allows for learning and development, it simultaneously opens youth up to a range of serious mental health risks); see also Yalda T. Uhls, Nicole B. Ellison & Kaveri Subrahmanyam, Benefits and Costs of Social Media in Adolescence, 140 Pediatrics S67 (2017) (noting that the benefits of social media use include social support, self-exploration, and self-disclosure); Kirsten Weir, Social Media Brings Benefits and Risks to Teens. Here's How Psychology Can Help Identify a Path Forward, 54 Monitor on Psych. 46 (Sept. 1, 2023) (explaining how adolescents are especially vulnerable to social media's "charms and harms" because "brain regions associated with the desire for attention, feedback, and reinforcement from peers become more sensitive" as adolescents' brains develop and at the same time "brain regions involved in self-control have not fully matured").

[22] Caroline Miller, Does Social Media Use Cause Depression?, Child. Mind Inst. (2023), https://childmind.org/article/is social-media-use-causing-depression/ # [https://perma.cc/N4FS-Z4H6] (noting that a possible source of youth depression may be the displacement of physical activity and activities that "generate a sense of accomplishment" like developing new skills and talents and that this displacement may be caused by the prevalence of social media screen-time); Jean M. Twenge, Thomas E. Joiner, Megan L. Rogers & Gabrielle N. Martin, Corrigendum: Increases in Depressive Symptoms, Suicide-Related Outcomes, and Suicide Rates Among U.S. Adolescents After 2010 and Links to Increased New Media Screen Time, 6 Clinical Psych. Sci. 3, 13 (2017), https://doi.org/10.1177/2167702617723376 (finding that the rise in screentime correlates to declines in non-screen activities and thus time spent on social media can be understood as a critical risk indicator for depression and suicide).

[23] See U.S. Pub. Health Serv., supra, at 10 (discussing excessive social media use by adolescents).

5. On May 23, 2023, U.S. Surgeon General Vivek Murthy released an advisory, calling for urgent action from stakeholders to better understand the impact of social media on young people.[24] Without directly admonishing social media companies, the Surgeon General expressed concern for how social media apps are designed and utilized by youth in the United States.[25] Although the creators of social media platforms are not legally responsible for the content posted by third parties, app features may perpetuate the harm caused by social media use.[26] Social media platforms profit from attention, but design efforts to garner such attention have adverse effects on youth. Social media applications are commonly designed to maximize time spent on the platforms and to increase user activity, which can result in excessive and compulsive use.

6. In his advisory, Surgeon General Murthy suggested that social media companies should take responsibility for the adverse effects their products have on young users, and he is not alone in his attempt to hold social media companies responsible for the youth mental health crisis.[27] In October of

[24] See Surgeon General Issues New Advisory About Effects Social Media Use Has on Youth Mental Health, U.S. Dep't Health & Human Servs. (May 23, 2023), https://www.hhs.gov/about/news/2023/05/23/surgeon-general-issues-new-advisory-abouteffects-social-media-use-has-youth-mental-health.html [https://perma.cc/FBC4-9U2M] (announcing the advisory and discussing key takeaways). The advisory was connected to the Department of Health and Human Services' efforts to aid President Biden's strategy to "transform mental health care for all Americans." Id.

[25] See U.S. Pub. Health Serv., supra, at 13 (suggesting that by using platforms designed for adults, youth are at risk of harm); see also Candice L. Odgers et al., Engaging, Safe, and Evidence-Based: What Science Tells Us About How to Promote Positive Development and Decrease Risk in Online Spaces, UCLA Ctr. Developing Adolescent 17 (Nov. 30, 2022), https://doi.org/10.31234/osf.io/rvn8q (noting that when social media apps designed for adults are used by adolescents, adolescents are at high risk of "using [them] in ways that are unsupervised, developmentally inappropriate, and potentially harmful").

[26] See 47 U.S.C. § 230(c)(1) (providing that "interactive computer services" are not responsible for content posted by users of their sites); Nesi et al., supra, 5, at 2 (indicating that social media design features result in both negative and positive experiences for youth online).

[27] See U.S. Pub. Health Serv., supra, at 16 (stating that social media companies "have a fundamental responsibility" to mitigate the risks associated with social media use); Emma Roth, Social Media Giants Must Face Child Safety Lawsuits, Judge Rules, The Verge (Nov. 14, 2023), https://www.theverge.com/2023/11/14/23960956/meta-google-tiktok-snap-socialmedia-addiction-lawsuits [https://perma.cc/XY5Y-JL9Y] (reporting that plaintiffs have filed various lawsuits against major social media companies). Across the country, individuals, school districts, and states have sued major social media companies for their role in the youth mental health crisis. See Roth, supra (stating that forty-two states sued Meta in 2023 alleging Facebook and Instagram's adverse impact on the psyche of young Americans, school districts across the country sued various social media companies for alleged emotional and physical harm to adolescents, and individuals have also filed suit); Makena Kelly, Dozens of States Sue Meta Over Youth Mental Health Crisis, The Verge (Oct. 24, 2023), https://www.theverge.com/2023/10/24/23930408/meta-instagram-facebook-child-safety-law-suitstates-kosa [https://perma.cc/F7QX-YFPA] (reporting broadly on the lawsuits against Meta).

2023, attorneys general across the United States sued Meta, the parent company of Instagram and Facebook, alleging that it knowingly created physiologically manipulative and harmful features and deceptively assured the public that their features were safe and appropriate for young users.[28]

**B. The Worst Fears About Social Media Are Confirmed.**

7. These well-publicized lawsuits against social media giants (the "media") revealed that families, local governments and school districts across the nation have been battling an unprecedented mental health crisis among their children for some time now. Ever-increasing numbers of children compulsively use these platforms, resulting in a situation that not only harms individual children and their loved ones but also causes substantial and financially burdensome interference with school district, county, and municipal operations. The suits alleged that school districts and local governments are on the front lines of redressing the damage caused by the media's deliberate choice to design, develop, operate, promote, distribute, and market their social media platforms to attract and addict youth.

8. Public education serves as the cornerstone of a just and equitable society, with its mission extending far beyond merely imparting knowledge.[29] It is a fundamental duty to nurture the minds of our children. Public school districts are facing serious financial and resource disruptions, interfering

[28] *See* Complaint at 1, Arizona v. Meta Platforms, Inc., No. 4:23-CV-05448 (N.D. Cal. Oct. 24, 2023) (alleging that Meta has "profoundly altered the psychological and social realities of a generation of young Americans," has deceived the public of the dangers of its social media sites, and has ignored the harm that its social media platforms inflict on the mental and physical health of youth). Meta maintains that they are committed to fostering safe online spaces; however, Meta whistleblower leaks indicate that company executives knew from internal studies that their platforms harm young users' well-being yet ignored these concerns. See id. at 19, 21, 73-74, 80, 100 (stating that Meta's internal user experience studies elucidate that users encounter damaging content on its platforms more frequently than Meta suggests in its "Community Standard Enforcement Reports," noting that employees have alerted senior management regarding these discrepancies, yet Meta continued to conceal the data, and alleging that in response to documents leaked by a whistleblower, Meta downplayed the findings of their internal research); Kelly, supra (discussing the whistleblower leaks that revealed documents indicating that internal studies found that "Instagram undermined the confidence of young users").

[29] K-12 Schools Now Primary Providers of Mental Health Services for Adolescents, EAB (Feb. 13, 2020) https://eab.com/insights/press-release/district-leadership/k12-schools-primary-providermental-health; National Survey on Drug Use and Health, SAMHSA (2019 & 1st & 4th Qs. 2020), https://www.samhsa.gov/data/report/2020-nsduh-detailed-tables (reporting that over 3.7 million children ages 12–17 received mental health services in an education setting in 2019, more than any other non-specialty mental health service setting).

with their educational mission, caused by the media's design, development, production, operation, promotion, distribution, and marketing of addictive and dangerous social media platforms targeting minors. As a result of the media's conduct, public school districts have been forced into a constant struggle for students' attention, as well as a constant struggle to provide the social, emotional, mental health, and learning support they need. From addressing the use of the media's platforms during class, in violation of school policy, to increased need for anxiety and depression counseling, the Plaintiff school districts have devoted substantial resources to combatting students' addiction to social media and the many resulting harms. School districts have even needed to revise lesson plans and teaching methods to account for the unique way that this social-media generation thinks, including reduced attention spans and reduced capacity for critical thinking.

9. Responding to the mental health crisis caused by the media stole resources from schools' primary objective of educating youth in a safe and healthy environment. In addition to teaching our children how to read and write, school districts' fundamental duty to educate students extends to teaching them how to lead healthy lives, including navigating the digital world we live in. Schools cannot ignore the importance of the online world in today's society. But teaching youth how to avoid the pitfalls of that world, including the addictive and dangerous features of the media's platforms, requires ever-increasing time and resources. Schools' limited resources are pitted against the media's virtually unlimited resources in that fight. This is not a fair fight, and despite considerable effort, schools are losing the battle.

10. Municipal and county governments are similarly burdened with time and expenses necessary to treat and address the youth mental health crisis that the media has caused. Municipal and county governments around the country provide a variety of mental health services as well as other community-based services such as outpatient therapy, behavioral health services, and afterschool programming for youth. They are unable to keep up with the demand for these services due in large

part to the mental health crisis caused by addiction to, and excessive use of, the media's social media platforms.

11. In recent years, American children's engagement with the media has grown exponentially. That explosion in usage is no accident. All platforms—including Instagram, Facebook, TikTok, Snapchat, and YouTube—intentionally induced young people to use them compulsively. Borrowing from the behavioral and neurobiological techniques used by makers of slot machines and tobacco products, the media deliberately embedded design features in their platforms to maximize youth engagement to drive advertising revenue. The media know young people are in a developmental stage that leaves them particularly vulnerable to the addictive effects of these features. The media target them anyway in pursuit of additional profit.

12. The U.S. Surgeon General explained that children versus Big Tech is "just not a fair fight."[30] "You have some of the best designers and product developers in the world who have designed these products to make sure people are maximizing the amount of time they spend on these platforms. And if we tell a child, use the force of your willpower to control how much time you're spending, you're pitting a child against the world's greatest product designers."

13. The media's strategy paid off. Users of their platforms now number in the billions, and the frequency and time spent by them has grown exponentially. Their enormous reach allowed the media to harvest a vast amount of personal user data from minors—from the school they attend, to the sneakers they covet, to the places they've been and the people they've met. This, in turn, allowed the media to mint a fortune by selling to others the ability to micro-target advertisements to incredibly specific slices of their own user bases.[31]

---

[30] Allison Gordon & Pamela Brown, Surgeon General says 13 is 'too early' to join social media, CNN (Jan. 29, 2023), https://www.cnn.com/2023/01/29/health/surgeon-general-socialmedia/index.html.

[31] See Snap, Inc., 2022 Annual Report (Form 10-K) at 15 (Jan. 31, 2023) ("[W]e rely heavily on our ability to collect and disclose data[] and metrics to our advertisers so we can attract new advertisers and retain existing advertisers. Any restriction or inability, whether by law, regulation, policy, or other reason, to collect and disclose data and metrics which our advertisers find useful would impede our ability to attract and retain advertisers.").

14. The media knew their actions seriously impacted young people and school districts, but refused to change their conduct. Indeed, the media recognized the importance of infiltrating high schools to their platforms' success. Meta, for example, categorized high schools as either Facebook or non-Facebook and analyzed Instagram penetration on a school level, i.e., which school Instagram users attend. Similarly, TikTok's internal documents revealed it knew it was disrupting students' school days and their sleep, thereby making focusing and paying attention at school more difficult. Once Snapchat knew it appealed to school-aged children, it "ran with it and never looked back." And YouTube directly advertised itself for use in schools, creating "tips and tricks for bringing YouTube into the classroom." The media also sold information regarding students' social media use to advertisers who wish to target youth at school, when they are around other youth, thereby increasing the spread of their advertisements.

15. Accordingly, the U.S. Surgeon General issued an advisory "to highlight the urgent need to address the nation's youth mental health crisis." In a scathing rebuke of the assault on our children, the Surgeon General recognized the dangerous designs in the media's platforms and their abdication of responsibility for the resulting harms:

> In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways . . . .
>
> [T]echnology companies must step up and take responsibility for creating a safe digital environment for children and youth. Today, most companies are not transparent about the impact of their products, which prevents parents and young people from making informed decisions and researchers from identifying problems and solutions.[32]

[32] U.S. Surgeon General's Advisory, Protecting Youth Mental Health (Dec. 7, 2021), https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf.

16. In 2022, the American Federation of Teachers—one of the largest teachers' unions in the United States—joined the #MakeMarkListen campaign, referring to Meta CEO Mark Zuckerberg. Recognizing the harm of social media on students, the campaign is organizing activities to demand oversight and accountability at Meta on behalf of children, based on the substantial harms caused by Meta's social media platforms. AFT President Randi Weingarten stated, "We're raising a giant red flag on the impact of Meta on kids' lives and how its platforms exacerbate the anxiety that comes with navigating our complicated world at a young age."[33] While this particular effort was aimed at Meta, the behavior of all social media was contributing to the harms raised by this group.

17. Compulsive social media use and addiction are negatively affecting student behavior in districts across the country. For example, Pinellas (Florida) County School Board Chairperson Laura Hine noted that, in her district, social media had resulted in "reduced attention spans, reduced cognitive development or delayed cognitive development, learning impacts, behavior, discipline, physical health, mental health, depression [and the] loss of life."[34] Tucson (Arizona) Unified School District had experienced students becoming violent and damaging classrooms when a teacher tries to take a student's phone away, which the District attributed to students' social media addiction. Additionally, an English teacher in Rutherford County, North Carolina, reported that "[s]ocial media has crippled my students when it comes to interacting with one another in person. Their very ability to communicate is deteriorating."[35]

18. The plaintiffs in these lawsuits alleged the media knew or should have known about the risks of such addiction, and they could have changed their conduct and their platforms to avoid the harm.

---

[33] Press Release, AFT Joint National Effort to Demand Corporate Governance Reforms at Meta (May 17, 2022), at pp. 1-2. https://www.aft.org/press-release/aft-joins-national-effort-demandcorporate-governance-reforms-meta.

[34] VerHelst, Megan, Pinellas Schools to Sue Social Media Giants Over Mental Health Crisis. https://patch.com/florida/stpete/pinellas-schools-sue-social-media-giants-over-mental-health-crisis.

[35] Social Media's Impact on Students' Mental Health Comes Into Focus at 2, NEA Today (Sept. 27, 2018).

They could have warned the public about the danger. Instead, the media placed growth first. Ultimately, the mounting evidence proved too much to ignore.

19. On May 26, 2026, California Attorney General Rob Bonta, as part of a bipartisan coalition of 51 attorneys general, announced a proposed settlement of the Attorney General's lawsuit against Meta. The settlement provides strong injunctive terms designed to help protect children from the mental health harms associated with social media, including default daily time limits on social media and a block on overnight use that can only be lifted by a parent, enhanced parental supervision tools, robust age assurance measures to detect users under 18 and children under 13 that are on the platform, and the appointment of an independent auditor to oversee compliance. The proposed settlement also includes a monetary payment of up to $17 billion to the states over ten years.[36]

### C. Addiction By Design

20. The public learned through such litigation that the excessive time spent online was not a coincidence. One by one, whistleblowers emerging from Silicon Valley's largest companies revealed that the tech industry manipulates users to spend as much time as possible on screens.[37] Extending users' time online is part of the tech industry's business model and is closely tied to its revenues. To meet their revenue goals, and keep users online, tech companies harp on human psychological vulnerabilities through different strategies.[38] They apply these strategies to devices ranging from

---

[36] https://oag.ca.gov/news/press-releases/attorney-general-bonta-secures-transformative-17-billion-settlement-meta

[37] Gaia Bernstein, A Window of Opportunity to Regulate Addictive Technologies, 2022 Wis. L. Rev. Forward 64, 68-69; Dara Kerr, Meta Failed to Address Harm to Teens, Whistleblower Testifies as Senators Vow Action, NPR (Nov. 7, 2023, 6:53.PM), https://www.npr.org/2023/11/07/1211339737/meta-failed-to-address-harm-to-teens-whistleblower-testifies-as-senatorsvow-act [https://perma.cc/68KV-TPJR]; Bianca Bosker, The Binge Breaker, The Atlantic (Nov. 2016), https://www.theatlantic.com/magazine/archive/2016/11/the-binge-breaker/501122/ [https://perma.cc/884Z-LK7J]; The Social Dilemma (Netflix 2020); Victor Ordonez, Key Takeaways from Facebook Whistleblower Frances Haugen's Senate Testimony, ABC News (Oct. 5, 2021, 4:47 PM), https://abcnews.go.com/Politics/key-takeaways-facebook-whistleblowerfrances- haugens-senate-testimony/story?id=80419357 [https://perma.cc/B2D2-MBLS]; Former Meta Executive Testifies on Social Media and Youth Mental Health, C-Span (Nov. 7, 2023), https://www.c-span.org/video/?531650-1/meta-executivetestifies-social-media-youth-mental-health # [https://perma.cc/S6C9-H4GU]; Justin Hendrix, Transcript: Senate Hearing on Social Media and Teen Mental Health with Former Facebook Engineer Arturo Bejar, Tech Pol'y Press (Nov. 8, 2023), https://www.techpolicy.press/transcript-senate-hearing-on-social-media-and-teen-mental-health-with-former-facebookengineer-arturo-bejar/ [https://perma.cc/9BQL-Q6WV].

[38] Daniel Susser, Beate Roessler & Helen Nissenbaum, Technology, Autonomy, and Manipulation, 8 Internet Pol'y Rev.

computers to tablets and smartphones. They use them on a wide array of internet platforms, including social media, games, dating apps, and entertainment websites.

21. Examples are plentiful. Social media companies use algorithms that prolong kids time online by exposing them to harmful and hate-invoking content.[39] Many tech platforms and devices use designs based on the intermittent reward model. Psychologists found that when people receive rewards, whether money, food, or social approval, on an unpredictable schedule, their brains release dopamine--a pleasure-enhancing neurotransmitter.[40] Tech companies apply insights from this model to different online designs to entice users to stay on for longer (e.g. notifications are an intermittent reward). Users hearing their phones beep or seeing the notification across their screen, repeatedly pick up their phones to find out what happened--hoping for a socially enhancing reward. The “pull to refresh” design also implements this model. Users pull to refresh Facebook or Instagram to check if they got new reactions to their post or to check if someone they are interested in has posted something new. They repeatedly pull to refresh, hoping for a reward. Tinder uses swipes in a similar way. Users keep swiping, and sometimes they get a dating match--a reward.[41]

22. Scientific research indicates that compulsive and addictive use of social media engenders negative physical and mental consequences for youth.[42] Drawing upon this research, the plaintiffs in In re Social Media alleged the media had created a mental health crisis among youth by designing

(Special Issue) 1 (2019).

[39] See, e.g., Protecting Kids Online: Testimony from a Facebook Whistleblower Before the Sub-Comm. on Consumer Prot., Prod. Safety, and Data Sec., 117th Cong. (2021) (statement of Frances Haugen, former employee of Facebook).

[40] Natasha Dow Schul, Addiction by Design: Machine Gambling in Las Vegas (2014); Michael D. Zeiler, Fixed-Interval Behavior: Effects of Percentage Reinforcement, 17 J. Experimental Analysis Behav. 177 (1972).

[41] See Adam Alter, Irresistible: The Rise of Addictive Technology and the Business of Keeping Us Hooked 76-77 (2017); Tristan Harris, How Technology Is Hijacking Your Mind--from a Magician and Google Design Ethicist, Medium (May 18, 2016), https://medium.com/thrive-global/how-technology-hijacks-peoples-minds-from-a-magician-and-google-s-designethicist-56d62ef5edf3 [https://perma.cc/NLB6-LTFZ].

[42] See, e.g., Twenge et al., supra, at 9 (discovering that youth who spend additional periods of time on screen activities were ““significantly” more likely to suffer from depressive symptoms or result in increased chances of “suicide-related” outcomes).

platforms that cause detrimental effects on their users, including depression, anxiety, body dissatisfaction, compulsive use, addiction, and self-harming behaviors.[43] The plaintiffs further alleged that defendants specifically target children to establish their core market, even though the companies are aware of the harm their platforms cause to child users.[44]

23. The complaint had put forth a multitude of ways that the social media platforms cause harm to adolescent users.[45] Many of the alleged design defects relate to the ways that the media's platforms maximize user engagement at the expense of promoting addictive and compulsive use.[46] Some of these design defects relate to how the platforms allow for the sexual exploitation of adolescents.[47] Specific design defect allegations are important to the overall legal analysis, as some defect claims are barred by § 230 and others are not.

---

[43] See Amended Master Complaint, supra, at 26 (stating that almost a decade of scientific studies demonstrates that features on the defendants' platforms have detrimental effects on the health of the mental health of their users); see also In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig., 702 F. Supp. 3d 804, 819 (N.D. Cal. 2023) (stating that the defendants knew that their platforms are harmful to child users based on research accessible from at least 2014 onwards and, in some cases, internal data indicating potential harm to youth); see also Georgia Wells, Jeff Horwitz & Deepa Seetharaman, Facebook Knows Instagram Is Toxic for Teen Girls, Company Documents Show, Wall St. J. (Sept. 14, 2021), https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739 [https://perma.cc/23ZX-E6MV] (reporting that Facebook, now Meta, knew that Instagram made teenage girls feel worse about their bodies). The plaintiffs further allege that the defendants' platforms can cause a variety of behavioral issues such as neglecting other responsibilities because of the magnitude of usage. Amended Master Complaint, supra, ¶ 97.

[44] See Amended Master Complaint, supra, at 12, 27-28 (alleging that the defendants designed and marketed their platforms to increase the quantity of children who download and use them compulsively and that the defendants knew that their platforms cause harm to child users).

[45] See In re Soc. Media, 702 F. Supp. 3d at 819-22 (listing functions of the defendants' platforms that allegedly cause harm to adolescents).

[46] See id. at 819 (stating that the master amended complaint "describes myriad ways in which the design of defendants platforms" cause harm to adolescents' well-being by encouraging addictive and compulsive use). It should be noted that the plaintiffs' complaint also alleges failure to warn defects, however, this Note focuses on the design defects allegations in order to provide a more succinct analysis of the interplay between design-based products liability, and § 230 and the First Amendment. See id. at 818 (listing the plaintiffs' priority claims, which include "Product-Based Negligent Failure to Warn" and "Strict Products Liability Failure to Warn" claims).

[47] See id. at 819 (discussing how the defendants' platforms facilitate the sexual exploitation of adolescents and the online dissemination of child sex abuse materials (CSAM)).

24. The design defects that contributed to compulsive and addictive use include endless content feeds, lack of screen limitations, ephemeral content, limitations on content length, and algorithmic prioritization of content.[48] In addition, the complaint alleged the media used intermittent variable rewards, also referred to as "IRV"--strategically timed dopamine-triggering rewards--to maximize engagement.[49] Moreover, the plaintiffs contended that by providing users with filters, social media apps proliferated idealized content, which had adverse effects on adolescents' body image.[50]

## II. FACTUAL BACKGROUND

### D. Netflix Uses Similar Technology To Spy On Children For Advertising Revenue.

22. Although Netflix initially lagged behind social media's use of surveillance technology to maximize profits, it's making up for lost time. Four months ago, the Texas Attorney General filed a *parens patria* suit to enjoin Netflix from harvesting "all that big data" for advertising. According to the Petition, "Netflix promised Texans one thing while it quietly built something different. For years, Netflix insisted it would never become another data-driven advertising company. It portrayed itself as a kid-friendly and ad-free Big Tech alternative. Netflix derided Google and Facebook for "serving two masters"—"the consumer" and "the advertiser".[51]

---

[48] See In re Soc. Media, 702 F. Supp. 3d at 819-21 (describing alleged defective features). Endless-content feeds include Facebook's "News Feed" which represents a continuous and never-ending feed of content, YouTube's "Autoplay" function, and TikTok's "For You" page. Id. at 819-20. Ephemeral content refers to the defendants' time limits on how long content can be viewed for. Id. at 820. Algorithmic prioritization describes the defendants' use of algorithms that promote specific content to individual users based on the likelihood that it will maintain their engagement on the platform. Id. at 821.

[49] See Amended Master Complaint, supra, at 19-20 (explaining how intermittent variable rewards (IVR) function and suggesting that they have highly addictive effects). An example of IVR is TikTok delaying showing a video a user is expected to connect with "until the moment before it anticipates the user would otherwise log out." Id.

[50] In re Soc. Media, 702 F. Supp. 3d at 821; see Amended Master Complaint, supra, ¶ 88 (claiming that the defendants' filters ""turbocharge" unhealthy upward comparison by allowing their users to post content that idealizes their life and results in "harmful body image comparisons"). The complaint further identifies the following design defects: (1) barriers to deleting accounts; (2) "quick add" recommendation functions that facilitate connections between child and adult users; (3) private chats (which may enable communications with "adult predators"); (4) sharing adolescents' location through geolocation; (4) ineffective age verification technology; and (5) lack of parental controls. In re Soc. Media, 702 F. Supp. 3d at 821-22.

[51] Texas's Original Petition and Application For Temporary and Permanent Injunctions, at 1.

23. The lawsuit's central claim is simple: Texans were told Netflix would not behave like a traditional advertising-driven tech company, but Netflix quietly became exactly that. The petition cites numerous public statements by Netflix executives, including CEO Reed Hastings, in which the company promised consumers that it did not rely on advertising or extensive data integration. According to the filing, Netflix repeatedly contrasted itself with companies that "serve two masters," meaning both users and advertisers.

24. Texas alleges those statements were materially misleading because Netflix simultaneously developed sophisticated systems to track users' viewing habits, searches, pauses, rewatches, browsing behavior, devices, location information, and interactions across the platform. The lawsuit quotes Netflix engineers describing the company internally as "a logging company that occasionally streams movies." According to the filing, Netflix's data operation grew into an industrial-scale infrastructure capable of processing billions of behavioral "events" every day. Texas claims the company now collects approximately five petabytes of user behavioral logs daily while processing over 10 million events per second. The lawsuit further alleges Netflix uses this information to develop advertising profiles, power recommendation algorithms, train AI systems, and collaborate with major advertising and data broker networks.

25. A major focus of the lawsuit involves Netflix's treatment of children and family accounts. Texas argues that Netflix spent years marketing its "Kids Profiles" as safe and segregated spaces specifically designed to protect children. During account creation, Netflix allegedly encouraged parents to create child-specific profiles and repeatedly advertised the platform as "Great for kids." The Attorney General contends Netflix created the impression that children would not be subjected to the same aggressive data collection practices used on adult users. However, Texas says Netflix still collected granular behavioral information from children through the same underlying telemetry and logging systems used elsewhere on the platform.

26. The lawsuit specifically targets Netflix's statements that it does not engage in "behavioral advertising" on kids' profiles. Texas argues this was misleading because, even if children were not directly shown targeted advertisements, Netflix still allegedly gathered the same behavioral data necessary to eventually facilitate targeted advertising and audience profiling. According to the petition, Netflix can monitor what children watch, rewatch, abandon, search for, pause, and interact with, allowing the company to develop highly detailed behavioral profiles. The filing frames this as a violation of parental trust and informed consent.

27. Another major component of the lawsuit centers around Netflix's ***platform design***. Texas alleges Netflix intentionally engineered its streaming platform to maximize addictive behavior and prolonged viewing sessions, especially among children. The filing repeatedly references "dark patterns," a term used to describe user interface designs intended to manipulate user behavior.

28. The lawsuit identifies ***autoplay*** as a primary example. According to Texas, Netflix deliberately enabled autoplay by default to eliminate natural stopping points between episodes and to keep users watching for extended periods. The filing claims autoplay reduces self-regulation, undermines parental control over children's screen time, and significantly increases the amount of behavioral data Netflix can collect from users.

29. Texas also points to Netflix's public embrace of "***binge-watching culture***" as evidence of the company's strategy. The lawsuit references Netflix marketing campaigns celebrating binge viewing, including promotions about "binge racing" entire seasons within 24 hours and social media posts joking about users repeatedly watching the same content for days at a time. The petition argues Netflix normalized excessive viewing behavior while failing to disclose the psychological and behavioral manipulation allegedly built into the platform.

30. The lawsuit argues Netflix's eventual pivot into advertising is what exposed the contradiction between its public promises and internal operations. Texas alleges that after years of assuring

consumers it would never become an advertising-driven platform, Netflix launched a sophisticated advertising ecosystem built around behavioral targeting and identity matching.

31. The filing describes partnerships between Netflix and companies such as Experian, Acxiom, Google Display & Video 360, The Trade Desk, Yahoo DSP, Amazon DSP, and LiveRamp. According to Texas, these relationships allow advertisers to combine Netflix user data with information gathered across the broader internet to create detailed advertising profiles and targeted campaigns. The lawsuit claims Netflix failed to adequately disclose these practices to consumers.

32. Texas further alleges that Netflix adopted "clean room" advertising collaboration systems where advertisers and data brokers can compare and enrich datasets involving Netflix users while keeping those processes largely hidden from the public. The petition repeatedly contrasts Netflix's consumer-facing privacy language with the more detailed advertising and marketing materials allegedly shared with advertisers and industry partners.

33. Texas's case is built around violations of the Texas Deceptive Trade Practices Act (DTPA). Texas accuses Netflix of misrepresenting that paid subscriptions shielded users from data-driven advertising, misrepresenting that children's profiles were insulated from behavioral data collection, and misrepresenting how user data was shared with third parties, as well as failing to disclose allegedly addictive and manipulative platform features. The state is seeking civil penalties of up to $10,000 per violation, along with potentially broader penalties involving elderly consumers.

34. Texas is also requesting injunctive relief that could force Netflix to fundamentally alter its business operations within the state. Among the remedies requested, Texas wants Netflix ordered to purge data deceptively collected from Texans, while also seeking to prohibit targeted advertising without express informed consent, as well as wanting Netflix barred from collecting children's behavioral data without parental consent. The Attorney General also requests that autoplay default settings on children's accounts be turned off.

35. On September 9, 2026, Florida's Attorney General filed a similar suit against Netflix with a familiar indictment: "Netflix went to market with a straightforward proposition: Consumers could pay a monthly subscription fee to avoid the behavioral surveillance that fuels ads-based businesses. That proposition was the cornerstone of Netflix's commercial identity as it evolved from a mail-order DVD company into one of the world's largest streaming platforms. Netflix repeatedly reinforced that identity, marketing itself as a kid-friendly, ad-free alternative to Big Tech surveillance."[52] According to the complaint:

> Netflix understood that consumers were increasingly concerned about the pervasive data collection that makes behavioral advertising possible. Rather than distance itself from those concerns, Netflix embraced them. It criticized Google and Facebook for "serving two masters"—"the consumer" and "the advertiser."1 In 2016, one of Netflix's vice presidents described this as the persistent "conflict" inherent in harvesting "all that big data" to support advertising. Those statements reinforced Netflix's promise that subscribers—not advertisers—were its customers.[53]

36. Netflix promised to flip the script by rejecting behavioral surveillance and advertising altogether. It repeatedly assured both subscribers and investors that its business model would remain fundamentally different from advertising-supported platforms. In a 2019 shareholder letter, Netflix assured investors they could "be confident" that any suggestion Netflix was "moving into selling advertising ... is false" and called this "a deep part of our brand proposition."[54]

37. Netflix's CEO reaffirmed that position during a January 2020 earnings call, explaining that, unlike Google, Facebook, and Amazon, Netflix was "not integrating everybody's data."[55] He promised Netflix was "not controversial that way" because it was "not trying to have access to" large amounts

---

[52] Plaintiff's Original Complaint, Seventh Judicial Circuit for St. Johns County, Florida, Docket No. 256635678 at ¶ 1.

[53] Id., at ¶ 2 (hereinafter "Complaint").

[54] July 17, 2019 Shareholder Letter, at 5, https://s22.q4cdn.com/959853165/files/doc_financials/quarterly_reports/2019/q2/Q2-19-Shareholder-Letter-FINAL.pdf; Complaint at ¶ 3.

[55] Netflix, Inc. FQ4 2019 Earnings Call Transcripts, at 14, S&P Global Market Intelligence (January 21, 2020), https://s22.q4cdn.com/959853165/files/doc_financials/2019/q4/Netflix-Inc.-Q4-2019-Earnings-Call-Jan-21-2020.pdf.

of user data. Netflix's CEO left little room for doubt: "We don't collect anything. We're really focused on just making our members happy, and we're not tied up with all that controversy around advertising."[56]

38. Netflix made similar promises to parents. Consistent with its carefully cultivated reputation as a privacy-conscious alternative to Big Tech, Netflix assured parents that kids profiles were separate environments designed to safeguard children's viewing experiences. From signup through movie night, Netflix repeatedly encouraged parents to create kids profiles, marketing them as "Great for kids."[57]

39. Netflix's representations that it would remain ad-free, refrain from collecting and integrating user data, and design kids' profiles to protect children were made at the highest levels of the company. But behind the scenes, Netflix was accumulating years of consumer data and building the behavioral-surveillance infrastructure that it would ultimately deploy for its advertising business in November 2022. That infrastructure was designed to keep Floridians and their children tethered to the screen, extract commercially valuable behavioral data, and ultimately commercialize that data in service of the very advertising business Netflix promised it would never build.[58]

40. To accomplish its goal of increasing screentime to gather maximum data, Netflix deceptively designs its product to undermine user choice, develop harmful habits in children, and frustrate user efforts to limit data collection or terminate their accounts. Netflix uses dark patterns to do this discreetly. Dark patterns are subtle designs that manipulate users to take the actions Netflix wants them to take.[59]

---

[56] Complaint at ¶ 4.

[57] Id. at ¶ 6.
[58] Id. at ¶ 8.
[59] Id. at ¶ 9.

41. Florida's AG doubled down on the autoplay feature. It alleges Netflix uses autoplay to intentionally strip away the natural breaking points that cue a user to step away from their screen. The feature is on by default for every profile, including kids' profiles. When one show ends, the next begins automatically—no action required, no pause to decide. Autoplay undermines parental control of screen time and content consumption. For a busy parent trying to manage a household under pressure, autoplay is a vise grip designed to keep her child fixed under Netflix's microscope. Netflix never told Floridians this.[60]

42. While getting children and families fixed on the screen, Netflix invested in a massive logging operation to record and monetize billions of behavioral user "events." To the public, Netflix presents itself as a mere content-streaming service. To Silicon Valley engineers, it is more candid: "We're really a [data] logging company ... a logging company that occasionally streams movies. And this is true.[61]

43. Netflix built this surveillance machinery to study how users and their children behave—what they click, how long they linger, what they avoid, when they pause, what draws them in, what they replay or skip, where they are, what devices they use, what other devices are in their home, what other apps they interact with, and much more. Each action is a data point revealing something about the user. This is not simply about deciding what show to queue up next. It is about learning who the users and their children are. Those are the kinds of unique insights Netflix would deploy in November 2022 to rebrand itself as the Big Tech advertising powerhouse it promised to never become.[62]

44. The complaint continues: Netflix does not disclose the true scale or granularity of this data collection. Worse yet, Netflix affirmatively misleads parents about how it surveils children by

[60] Id. at ¶ 10.

[61] Peter Bakas (Netflix engineer), How Netflix Handles Data Streams Up to 8MEvents/sec, YouTube (March 8, 2016), https://www.youtube.com/watch?v=WuRazsX-MBY; Complaint at ¶ 11.

[62] Complaint at ¶ 12.

repeatedly representing that it does not engage in behavioral advertising on kids' profiles.[63] Netflix's repeated assurances that children are not subjected to behavioral advertising are crafted to convey that children are not being tracked, profiled, or monitored for commercial purposes. Yet that representation omits a critical fact: even if Netflix does not currently display targeted ads to children it still collects substantial behavioral data about them. Netflix does not provide parents with a clear or meaningful disclosure regarding those data-collection practices.[64]

46. Netflix's endgame is simple and lucrative: get children and families glued to the screen, harvest their data while they are stuck there, and then monetize the data for a handsome profit. The results speak for themselves. Between 2018 and 2026, Netflix's annual revenue climbed from about $15 billion to a projected $50 billion or more, while paid memberships nearly tripled—from just over 130 million to well beyond 300 million.[65]

47. Netflix's explosive financial growth reflects a deliberate choice to cash in on the trust it spent years cultivating under false pretenses. In 2022, Netflix pivoted into digital advertising, leveraging the mountains of data it quietly extracted from the children and families it kept fixated on their screens. In doing so, Netflix joined the very industry—and adopted the same "controversial" practices—that it had always warned was built on harvesting big data to serve the advertiser.[66]

48. The undisclosed truth is that Netflix is not simply serving an occasional ad. Having spent years publicly distinguishing itself from surveillance-driven technology companies, Netflix now secretly opens consumer data to the same advertising apparatus it once denounced. Netflix even allows third-party advertisers and advertising technology companies to connect information they possess about a consumer with information Netflix has collected about that same consumer. At no point did Netflix obtain the requisite consent from its subscribers for such data matching and commercialization.[67]

[63] Id. at ¶ 13.
[64] Id. at ¶ 14.
[65] Id. at ¶ 15.
[66] Id. at ¶ 16.
[67] Id. at ¶ 17.

49. Beyond advertisers, Netflix opens its users' data to commercial data brokers like Experian and Acxiom—entities entirely unrelated to streaming entertainment. Netflix has also partnered with dominant ad-tech platforms, including Google Display & Video 360, LiveRamp, and The Trade Desk, to facilitate linking Netflix user data with information about what Netflix's users do off Netflix.[68]

50. Consumers would be shocked to learn how extensively Netflix shops their data across Big Tech's shadowy networks. The years of behavioral data Netflix commercialized for advertising beginning in November 2022 paints a mosaic that reveals far more about a user's identity, beliefs, life stage, activities, and choices than any individual data point ever could. That is exactly what Netflix is selling to the Big Tech industry. That is exactly what Netflix fails to explain to consumers.[69]

51. Under Florida (and Ohio) law, consumers have a right to the truth. Businesses must provide clear and candid disclosures, not omissions or half-truths that obscure material information. Yet Netflix earns billions of dollars every year by quietly deploying the exact playbook it publicly condemned to lure consumers in the first place. Netflix's years-long bait-and-switch has led the company right to where it promised never to be: addicting children and families to its platform, mining those users for data, and then converting that data into lucrative intelligence for global advertising juggernauts.[70] In addition to violating Ohio's Consumer Sales Practices Act, Netflix should be held liable for statutory product liability (which includes creating a public nuisance).

## III. PLAINTIFFS

52. Plaintiff Kayla Mosley is a resident of this District, residing at 561 Kruger Avenue, New Franklin, Ohio 44319. Ms. Mosley is the mother of three minor children—E.M., H.M. and C.M. She brings this class action individually as the children's legal guardian and on behalf of all others similarly situated. She has been an Extra Member of Netflix's product for several years.

---

[68] Id. at ¶ 18.
[69] Id. at ¶ 19.
[70] Id. at ¶ 20.

53. Plaintiff Jonathan Austin is a resident of this District, residing at 338 Indianola Rd., Boardman, Ohio 44512. Mr. Austin has one minor child, L.A. He brings this class action individually as L.A.'s legal guardian and on behalf of all others similarly situated. He has been a Household Member of Netflix's product since 2017.

54. Plaintiffs' minor children watch various Netflix programs targeting youth. As parents, Plaintiffs are anxious about Netflix's use of technology to encourage binge-watching programs for the ulterior motive of gathering information useful to advertisers that will, in turn, increase Netflix's profits. They are also worried about the present and long-term effects of Netflix's defective program design on their children's mental health.

## IV. DEFENDANT

55. Defendant Netflix Inc. ("Netflix") is a Delaware corporation, publicly traded under the NYSE ticker symbol "NFLX," with its principal place of business at 100 Winchester Circle, Los Gatos, CA 95032.

56. Netflix is a global subscription streaming service with more than 325 million paid memberships in over 190 countries. It licenses and produces series, films, live events, games and video podcasts, then sells access through three kinds of US plans: an ad-supported tier at $8.99 a month, Standard at $19.99 and Premium at $26.99. Memberships bring in the large majority of revenue. Advertising is the second stream, on track for about $3 billion in 2026, roughly 6% of a guided $51.0 to $51.4 billion. The model works because content is a fixed cost and members are a variable revenue: every extra subscriber, price step or ad impression lands on a content bill Netflix has already paid.

57. Netflix launched a $6.99 ad tier in November 2022 after a decade of insisting it would never run ads. Under a mission of entertaining the world, a lower price point is straightforward mission expansion. Ad revenue passed $1.5 billion in 2025, more than 2.5 times the 2024 figure, and Netflix expects it to roughly double again in 2026. At the May 2026 upfront, advertising president Amy

Reinhard put ad-tier reach above 250 million monthly active viewers globally, up from 94 million a year earlier, with more than 80% of ad-tier members watching weekly.

## V. JURISDICTION AND VENUE

58. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2) (the Class Action Fairness Act) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from Netflix.

59. This Court has jurisdiction to enter declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties regarding Netflix's liability to customers such as Plaintiff with respect to the unauthorized collection of data regarding her children's viewing habits and the systemic controls that encourage binge-watching of programs to increase Netflix's profits. This Court has personal jurisdiction over Netflix because it maintains a content delivery network (CDN) that distributes movies, TV shows, and other media content to Netflix customers throughout the state. The service includes Netflix Open Connect (OCA), Netflix-managed infrastructure deployed inside Netflix and ISP partner networks. Netflix also maintains at least two "Points of Presence" (applications for optimizing delivery efficiency) in Columbus and Cincinnati.

60. Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiffs reside in this District, and a substantial portion of the events giving rise to this action occurred in this District, including Plaintiffs' memberships in Netflix's programming.

## VI. CLASS ACTION ALLEGATIONS

61. Plaintiffs bring this action on behalf of themselves individually and as next friends to their minor children, as well as on behalf of all others similarly situated, as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3), and (c)(4). The Class is initially defined as follows:

> **All Ohio residents who subscribed to Netflix's streaming product as a Household or Extra Member at any time since September 26, 2024 and are also parents or legal guardians of one or more minor children (who are thereby included in the class by adult representation).**

62. Excluded from the Class are: (a) Defendant; (b) subsidiaries and affiliates of Defendant; (c) any person or entity who is an officer, director, employee, or controlling person of Defendant; (d) any entity in which Defendant has a controlling interest; (e) the legal representatives, heirs, successors, and assigns of any excluded party; and (f) any judicial officer presiding over this action, the members of his or her immediate family and staff, and any juror assigned to this action.

63. The Class Period begins September 26, 2026 and ends with the conclusion of this litigation. Plaintiffs reserve the right to amend or modify the class definition with greater specificity, by further division into subclasses, and/or by limitation to particular issues. As described below, the Class satisfies the elements of Fed. R. Civ. P. 23(a) and Rule 23(b).

64. ***Numerosity***. The Members of the Class are so numerous that joinder of all Members is impracticable. Netflix claims it has 325 million paid subscribers. The company has been listed on Nasdaq since 2002 and is ranked 117th on the Fortune 500 and 219th on the Forbes Global 2000. At $450 billion, it is the largest entertainment/media company by market capitalization.

65. ***Typicality***. Plaintiffs' claims are typical of the claims of Class Members. Throughout the Class Period, Plaintiffs' minor children regularly watched Netflix programs. Plaintiffs' claims are also typical of other Class Members in that their children have been prone to binge-watching Netflix programs without proper parental controls. As parents, Plaintiffs are very concerned about the current and long-term effects of their children's mental well-being in the absence of mature self-regulation of Netflix's defective program design.

66. ***Adequacy***. Plaintiffs will fairly and adequately protect the interests of the putative Class and have retained counsel competent and experienced in class action litigation. Plaintiffs are committed to the vigorous prosecution of this action and have no interests that are adverse or antagonistic to the Class.

67. ***Superiority***. A class action is superior to any other available means for the fair and efficient adjudication of the Class' claims. The damages suffered by certain individual Members of the Class are relatively small compared to the burden of individual prosecution of the complex litigation required to recover from Netflix. It would be impractical for most, if not all, Class Members to seek relief on an individual basis. Furthermore, individual litigation could result in thousands of individual lawsuits, introducing the risk of inconsistent judgments and increasing the delay and expense to all parties. In contrast, a class action

would present far fewer administrative difficulties. The Members of the Class are ascertainable through methods typical of class action practice and procedure, including through Netflix's own transactional records.

68. ***Predominance of Common Questions of Law and Fact***. Numerous questions of law and fact are common to Plaintiff and all Members of the Class. These common questions will result in common answers for all Class Members that will impact the resolution of the claims on grounds equally applicable to all Class Members. These common questions, which predominate over any questions affecting only individual Class Members, include, but are not limited to:

a. Whether parents can bring the claims alleged as "next friend" to their children;

b. Whether Netflix owes a legal duty to Class Members regarding their surveillance of children's screening habits;

c. Whether Netflix can surveil the children's screening habits without the parents' authorization;

d. Whether the structure of Netflix's surveillance program constitutes a "product" for purposes of Plaintiffs' product liability theory;

e. Whether the structure of Netflix's surveillance program constitutes a public nuisance;

f. Whether Netflix's conduct constitutes an unfair practice under Ohio's CSPA;

g. Whether Netflix's failure to disclose its surveillance of children's screening habits constitutes a material omission or misrepresentation under the consumer statutes;

h. Whether Netflix's deception or product has harmed Class Members;

i. The measure of damages available to Plaintiffs and the Class attributable to parental anxiety and/or actual damage to children's mental well-being due to the structure of Netflix' defective product;

69. ***Rule 23(b)(2) Class Certification***. Netflix has acted in a manner that applies generally to the proposed Class, making both declaratory and injunctive relief appropriate with respect to the proposed Class as a whole.

## VII. CAUSES OF ACTION

### COUNT I

***Violation of the Ohio Consumer Sales Practices Act ("OCSPA") (R.C. 1345, et. seq.)***

70. Plaintiffs incorporate the foregoing allegations in this complaint as if fully set forth

herein.

71. The Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Rev. Code Ann. § 1345.01 et seq., prohibits suppliers from committing unfair or deceptive consumer sales practices in connection with a consumer transaction.

72. Plaintiffs and each Class Member is a "consumer" within the meaning of R.C. § 1345.01(D), having purchased a product from Netflix for personal, family, or household purposes.

73. Netflix is a "supplier" within the meaning of R.C. § 1345.01(C), regularly engaged in the business of selling consumer products to Ohio residents.

74. Plaintiffs, the Class Members and Netflix engaged in a "Consumer Transaction" as that term is defined under the OCSPA. Each membership subscription (whether a Household or Extra Membership) constitutes a "consumer transaction" within the meaning of R.C. § 1345.01(A).

75. The OCSPA prohibits a supplier from committing an unfair or deceptive act or practice in connection with a consumer transaction, whether it occurs before, during, or after the transaction. R.C. § 1345.02(A). That "after the transaction" language is critical — it expressly reaches post-sale conduct such as surveilling children's screening habits without the parent's authorization. Netflix's systemic but secret encouragement of binging-watching is also an unfair and deceptive act.

76. According to R.C. §1345.02(B)(1), it is *per se* deceptive for a supplier to represent that "the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have."

77. Netflix's representation that its product is "safe for kids" (when there is overwhelming evidence to the contrary) constitutes a *per se* violation of R.C. §1345.02(B)(1).

78. Netflix's failure to disclose that it uses surveillance data of children's screening habits to increase advertising income is a separate *per se* violation of R.C. §1345.02(B)(1).

79. According to R.C. §1345.02(B)(10), it is also *per se* deceptive for a supplier to represent that a consumer transaction "involves or does not involve a warranty, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false."

80. Netflix's breach of its stated obligation to ensure Netflix's programming is safe for

children constitutes a separate *per se* violation of R.C. §1345.02(B)(10).

81. According to O.A.C. Rule 109:4-3-10(A), it is also a deceptive act or practice to "Make any representations, claims, or assertions of fact, whether orally or in writing, which would cause a reasonable consumer to believe such statements are true []".

82. Because Netflix's representation that its product is "safe for kids" (when there is overwhelming evidence to the contrary) caused reasonable parents to believe such statement was true, Netflix's representation was a deceptive act or practice under O.A.C. Rule 109:4-3-10(A).

83. Ohio Courts have held that substantially similar conduct to that alleged in paragraphs 76-82 by a supplier constitute deceptive acts under the OCSPA.

84. The OCSPA is a remedial statute designed to protect consumers and is to be liberally construed in their favor. *Price v. Evans Auto. Repair, Inc.*, 2024-Ohio-5108 (2024); *Einhorn v. Ford Motor Co.*, 48 Ohio St. 3d 27 (1990). Netflix's conduct undermines the fairness and transparency that the OCSPA seeks to ensure in consumer transactions.

85. Netflix's unfair and deceptive practices were willful, as Netflix possessed actual knowledge of the challenged conduct but chose not to disclose the truth to Class Members.

86. Plaintiff and the Class Members were damaged as a proximate result of Netflix's unfair and deceptive practices, in an amount to be determined by jurors at trial.

87. By engaging in the foregoing conduct, Netflix has engaged in unfair or deceptive acts in violation of Ohio Rev. Code Ann. §§ 1345.01 et seq. with respect to Class Members' Netflix subscriptions.

**COUNT II**

***Statutory Product Liability***

88. Plaintiffs incorporate the foregoing allegations in this complaint as if fully set forth herein.

89. Pursuant to R.C. 2307.71(A)(13), a product liability claim is "a claim or cause of action that is asserted in a civil action pursuant to sections 2307.71 to 2307.80 of the Revised Code and that seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person,

emotional distress, or physical damage to property other than the product in question, that allegedly arose from any of the following:

(a) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;
(b) Any warning or instruction, or lack of warning or instruction, associated with that product;
(c) Any failure of that product to conform to any relevant representation or warranty."

90. A product liability claim also includes "any public nuisance claim or cause of action at common law in which it is alleged that the design, manufacture, supply, marketing, distribution, promotion, advertising, labeling, or sale of a product unreasonably interferes with a right common to the general public."

91. Netflix spent years marketing its "Kids' Profiles" as safe and segregated spaces specifically designed to protect children. As a result, various functionalities of Netflix's program design for surveilling children's streaming habits (e.g. parental controls, limitation on screen time, account deactivation) constitute "products" that are "content agnostic" for purposes of finding liability under R.C. 2307.71(A)(13).

92. Contrary to the program's original design, Netflix intentionally engineered its streaming platform through "dark patterns" that maximize addictive behavior and prolonged viewing sessions, especially among children. Netflix's endless content feeds, lack of screen limitations, ephemeral content, limitations on content length, and algorithmic prioritization of content all contribute to minor children's compulsive and addictive use.

93. For example, Netflix deliberately enabled "autoplay" by default to eliminate natural stopping points between episodes and keep users watching for extended periods. In doing so, Netflix reduced self-regulation, undermined parental control over children's screen time, and significantly increased the amount of behavioral data Netflix can collect from users.

94. More specifically, Netflix encourages parents to create child-specific profiles during account creation and then repeatedly advertises the platform as "Great for kids." This program design creates the

reasonable impression in parents' minds that their children will not be subjected to the same aggressive data collection practices used on adult users. Nonetheless, Netflix collects granular behavioral information from children through the same underlying telemetry and logging systems used elsewhere on the platform. Netflix monitors what children watch, rewatch, abandon, search for, pause, and interact with, allowing Netflix to develop highly detailed behavioral profiles.

95. Netflix's intentional modification of its original program design for children is a "defect" for purposes of liability under R.C. 2307.71(A)(13). In contrast to parents' reasonable expectations of safety, the foreseeable risks of harm presented by Netflix's product could have been avoided or mitigated by a reasonable alternative design.

96. Due to the minor children's inability to detect the danger from these design defects and Plaintiffs' lack of parental controls to protect their children from the danger, Netflix owed Plaintiffs, the minor children and all others similarly situated the duty to design such products in a reasonably safe manner and to warn about risks they pose in order to ensure Netflix's programming for children remained safe as advertised.

97. Netflix's intentional alteration of the original program design for children for profit breached the duty owed to Class Members.

98. Plaintiffs and the class have been damaged as a direct and foreseeable result of Netflix's negligent product design. Both individually and on behalf of all member parents, Plaintiffs expect to prove their own emotional distress caused by Netflix's defective product. Both individually and on behalf of all minor children, Plaintiffs expect to prove that the defective features of Netflix's product design have caused and contributed to a range of negative physical, mental, and emotional health outcomes (including, without limitation, addiction, cognitive development problems, depression, anxiety, difficulty focusing, inadequate self-regulation, lack of sleep, and social isolation) due to their children's addition to watching Netflix programming.

**COUNT III**

***Injunctive Relief Under Federal Rule Of Civil Procedure 23(b)(2)***

99. Plaintiffs incorporate the foregoing allegations in this complaint as if fully set forth herein.

100. Federal Rule of Civil Procedure 23(b)(2) permits class certification where the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

101. Netflix has acted and continues to act on grounds generally applicable to the Class.

102. Absent injunctive relief, Netflix will continue to harm parents and children through a defective product design that remains secret by deception. This harm is imminent.

103. Plaintiffs and the Class will suffer irreparable harm absent injunctive relief. Monetary damages alone may be inadequate to remedy the harm because preventing an impending mental health crisis trumps compensating for it afterward.

104. Plaintiffs therefore request that the Court, pursuant to Federal Rule of Civil Procedure 23(b)(2), enter injunctive relief:

a. Enjoining Netflix from continuing to operate the defective product design identified herein that is harming parents and their minor children who watch Netflix programming;

b. Ordering Netflix to correct the defective functionalities in its product design that are currently harming parents and their minor children who watch Netflix programming.

105. The proposed injunctive relief is appropriate respecting the Class as a whole because Netflix's conduct and the requested relief apply uniformly and without differentiation to all Class Members.

**VIII. PRAYERS FOR RELIEF**

**CLASS ALLEGATIONS**

106. Plaintiffs pray this Court grant the following relief pursuant to Rule 23 of the Federal Rules of Civil Procedure:

a. Certify Plaintiffs' claims for class-wide treatment;

b. Appoint Plaintiffs as class representatives;

c. Appoint Plaintiffs' counsel as Class Counsel.

**CONSUMER SALES PRACTICES ACT (R.C. 1345.O2, et seq.)**

107. Pursuant to R.C. § 1345.09:

a. Enter an Order declaring that Netflix's actions violate the Ohio Consumer Sales Practices Act and/or equitable principles underlying the Ohio claims under the Ohio Consumer Sales Practices Act;

b. An injunction prohibiting Netflix from engaging in the deceptive and unfair acts and practices described herein;

c. Order Netflix to purge data deceptively collected from Ohioans, to discontinue targeted advertising without express informed consent, to cease collecting children's behavioral data without parental consent, and to turn off autoplay default settings on children's accounts.

d. Award Plaintiffs and the Ohio Class actual damages, and such other statutory relief as is available, pursuant to the Ohio Consumer Sales Practices Act, in an amount to be determined at trial;

e. Because Netflix's violations were willful within the meaning of R.C. § 1345.09(B), award noneconomic damages of not more than $5,000 per violation;

f. Reasonable attorneys' fees pursuant to R.C. § 1345.09(F)(2); and

g. Such other relief as the Court deems appropriate.

**PRODUCT LIABILITY (R.C. 2307.71, et seq.)**

108. Pursuant to R.C. 2307.71:

a. Enter an Order declaring that Netflix's actions violate Ohio's Products Liability statute and/or equitable principles underlying the Ohio claims under the Act (including the additional finding that Netflix created a public nuisance);

b. Enjoin Netflix from continuing to operate the defective product design for surveilling children's streaming habits identified herein that is harming parents and their minor children who watch Netflix programming;

c. Order Netflix to correct the defective functionalities in its product design that are currently harming parents and their minor children who watch Netflix programming.

d. Order Netflix to purge data deceptively collected from Ohioans, to discontinue targeted advertising without express informed consent, to cease collecting children's behavioral data without parental consent, and to turn off autoplay default settings on children's accounts.

e. Award Plaintiffs and the Ohio Class compensatory damages for the actual harm caused by Netflix's defective product, including (without limitation) emotional distress, mental anguish, and other mental health complications, in an amount to be determined at trial;

f. Reasonable attorneys' fees; and

g. Such other relief as the Court deems appropriate.

**INJUNCTIVE RELIEF UNDER F.C.R.P. 23(B)(2)**

109. Plaintiffs request that the Court, pursuant to Federal Rule of Civil Procedure 23(b)(2), enter injunctive relief:

a. Enjoining Netflix from continuing to operate the defective product design for surveilling children's streaming habits identified herein that is harming parents and children who subscribe to or watch Netflix programming;

b. Ordering Netflix to correct the defective functionalities in its product design to ensure no future surveillance is harming parents and children who subscribe to or watch Netflix programming.

110. Award Plaintiffs and the Ohio Class compensatory damages for the actual harm caused by Netflix's actions, including (without limitation) emotional distress, mental anguish, and other mental health complications, in an amount to be determined at trial;

111. Reasonable attorneys' fees; and

112. Such other relief as the Court deems appropriate.

## IX. DEMAND FOR A JURY TRIAL

In accordance with Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ George W. Cochran*
George W. Cochran (0031691)
1981 Crossfield Circle
Kent, Ohio 44240
Telephone: (330) 607-2187
lawchrist@gmail.com

Attorney for Plaintiffs and the Putative Class